UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-                                                    S12 14 Cr. 716 (VM)

IBRAHIM AKASHA ABDALLA,

                                   Defendant.

**THE GOVERNMENT'S SENTENCING MEMORANDUM AS TO
DEFENDANT IBRAHIM AKASHA ABDALLA**

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
*Attorney for the United States
of America*

Emil J. Bove III
Amanda L. Houle
Jason A. Richman
    Assistant United States Attorneys
    *Of Counsel*

**Table of Contents**

I. Introduction ................................................................................................................ 1

II. Offense Conduct....................................................................................................... 2

    A. Summary and Historical Conduct of the Defendant ......................................... 3

    B. The Defendant Paid Bribes to Access Methaqualone and Distributed Tons of Methaqualone Within South Africa ........................................................................ 4

    C. Heroin and Methamphetamine Importation Conspiracy .................................. 5

    D. Rampant Bribery and Corruption Funded by Drug Sales ............................... 11

    E. Firearms and Violence .................................................................................... 12

III. Procedural History ................................................................................................ 17

IV. A Guidelines Term of Life Imprisonment is Appropriate .................................... 18

    A. Applicable Law ............................................................................................... 18

    B. Analysis .......................................................................................................... 20

        1. The Nature and Circumstances of the Offense ........................................... 20

        2. The History and Characteristics of the Defendant ...................................... 22

        3. The Need to Afford Adequate Deterrence ................................................... 25

        4. The Defendant's Submission ....................................................................... 26

V. The Court Should Impose a Within-Guidelines Fine .......................................... 30

    A. Applicable Law ............................................................................................... 30

    B. Discussion ....................................................................................................... 31

VI. Conclusion ............................................................................................................ 31

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-                                                                        S12 14 Cr. 716 (VM)

IBRAHIM AKASHA ABDALLA,

Defendant.

## I. Introduction

The Government respectfully submits this memorandum in advance of the sentencing of defendant Ibrahim Akasha Abdalla ("Ibrahim Akasha"), scheduled for November 8, 2019, and in support of a substantial term of imprisonment similar to that imposed on his co-defendant, Baktash Akasha Abdalla, and a fine in the range of $50,000 to $10 million.

For years, Ibrahim Akasha was a prime mover of massive quantities of narcotics. He protected his drug trade with firearms and violence, at times to deadly effect.  In 2014, the defendant and his brother, Baktash Akasha Abdalla ("Baktash Akasha" and collectively with the defendant, the "Akashas") jumped at the opportunity to expand their transnational criminal organization (the "Akasha DTO") to the profitable retail market of the United States.  They engaged in months of negotiations, traveled to visit potential suppliers, and eventually obtained heroin and methamphetamine to provide to their customers.  While the quantity of narcotics they actually sold for distribution in the United States was staggering—including almost 100 kilograms of heroin—it represented a small fraction of the *tons and tons* of poison they hoped and planned to send to this community.

The defendant was involved in all aspects of the Akasha DTO's drug trafficking and plans for distribution to the United States.  He participated in meetings with the other members

of the Akasha DTO and their purported suppliers and customers, he bragged of his history of distributing tons of drugs, and he was trusted to deliver millions of dollars worth of heroin in Nairobi, Kenya. The defendant also violently protected the Akasha's drug distribution empire. He possessed multiple firearms, which he brandished with both reckless abandon and targeted intimidation, and he participated in several acts of violence, including the murder of a drug-trafficking rival.

Throughout his submission, the defendant minimizes his role. To be sure, and as reflected in their respective plea agreements, the Government views Baktash Akasha as the leader of the Akasha DTO and Ibrahim Akasha as his lieutenant. Ibrahim Akasha, however, was a violent drug dealer of massive proportions. He was Baktash Akasha's lieutenant, and was directly involved in all aspects of the Akasha DTO's operations. He had a penchant for guns and violence, as demonstrated at the *Fatico* hearing and by the numerous photographs of firearms found on his cell phone. And he was deeply involved in the Akasha DTO's most recent criminal chapter, its efforts to avoid the reach of this Court's authority through a pattern of drug-fueled bribery in Kenya. Ultimately, despite his best efforts to do so, Ibrahim cannot escape the consequences of his own dangerous and corrupt crimes by focusing on those of his brother. If anything, the criminal activity of the defendant's brother, all of which was in furtherance of their conspiracy and foreseeable to the defendant, speaks to the heinous nature of the defendant's own criminal conduct.

## II.  Offense Conduct

The initial Presentence Investigation Report was issued on December 20, 2018 and the defendant made a number of objections to the offense conduct section. The final Presentence Investigation Report (the "PSR") was then issued on or about June 26, 2019. While the defendant eventually withdrew certain of his objections, the Court held a 2-day hearing pursuant to *United*

2

*States v. Fatico*, 603 F.2d 1053 (2d Cir. 1979) on July 25 and 26, 2019 (the "*Fatico* Hearing") to resolve the remaining factual disputes, including the extent of the defendant's violence and use of guns, and his participation in a murder.  At the conclusion of the *Fatico* Hearing, the Court found that the witness—one of the defendant's co-conspirators, Vijaygiri Anandgiri Goswami ("Goswami")—was credible and was "corroborated by other evidence that the parties have brought to the Court's attention."  *Fatico* Hearing Transcript ("Fatico Tr.") 245.  The Court thus overruled the defendant's remaining objections to the PSR.  Fatico Tr. 245-46.

### A.  Summary and Historical Conduct of the Defendant

The Akasha DTO distributed multiple drugs around the world over the course of decades.  *See* PSR ¶¶ 40, 46.  The defendant's brother, Baktash Akasha, became the leader of the Akasha DTO after his father was killed in the Netherlands in 2000.  PSR ¶ 40. The Akasha DTO worked with other large-scale international drug traffickers, including co-defendant Vijaygiri Anandgiri Goswami ("Goswami"), co-defendant Gulam Hussein ("Hussein") and co-defendant Muhammad Asif Hafeez ("Hafeez").   PSR ¶¶ 46-48.  The defendant was his brother's main lieutenant.  PSR ¶ 105.

The Akasha DTO was involved in extensive criminal activity in Kenya, including trafficking in ton quantities of hashish and a schedule I controlled substance called methaqualone (more commonly known as "quaaludes"), and multi-hundred-kilogram quantities of cocaine, heroin, and methamphetamine.  *See* PSR ¶ 41.  In connection with this investigation alone, the Drug Enforcement Administration (the "DEA") seized 99 kilograms of high-quality heroin and 2 kilograms of methamphetamine from the Akasha DTO, and 500 kilograms of heroin were in transit to the Akasha DTO at the time of the defendant's arrest.  *Id.*  These quantities are staggering—

equivalent to millions of doses of heroin intended for the streets of New York.[1]  In addition, the defendant and his co-defendants bribed and caused others to pay bribes to law enforcement throughout Africa, including in Kenya, and the defendant possessed a number of firearms during his drug trade.  *Id.*  Finally, as further detailed below, the defendant participated in a number of assaults, certain of which were captured on video, and the murder of at least one man, who was associated with a rival drug trafficker.  *Id.*

## B. The Defendant Paid Bribes to Access Methaqualone and Distributed Tons of Methaqualone Within South Africa

One focus of the Akasha DTO was the distribution of methaqualone, a Schedule I controlled substance regulated by the DEA that acts as a highly addictive sedative and hypnotic. *See* 21 C.F.R. § 1308.11.  In 2013, the defendant, along with his brother, informed Goswami that they had access to approximately 10 tons of a methaqualone precursor known as "abba."  PSR ¶ 49.  The stash had been seized by Kenyan authorities after it was shipped to Kenya by one of the Akashas' rival drug dealers, David Armstrong ("Armstrong").  *Id.*  The Akashas told Goswami that they could access the drug stash by paying bribes, and sought his assistance in finding a manufacturer in South Africa with the capacity to purchase the precursor in large quantities for production and resale.  *Id.*   The defendant was responsible for handling logistics of paying bribes

---

[1] A sample of the heroin seized during the course of this investigation was laboratory tested by the DEA, and the substance purity was determined to be approximately 75 percent.  Recent studies by the DEA  indicate that street-level heroin is closer to 30 percent pure, indicating that the drugs distributed by the Akasha DTO were, as they promised to their customers, a high purity, and were going to be diluted with cutting agents, likely multiple times, before reaching end-user customers in the United States.  *See* U.S. Dep't of Justice, *2018 National Drug Threat Assessment*, available at  https://www.dea.gov/sites/default/files/2018-11/DIR-03218%202018%20NDTA%20final%2 0lo w%20resolution.pdf.  As an individual dose of heroin can be as small as .1 grams, the 99 kilograms provided by the Akasha DTO represent, conservatively, almost one million individual doses standing alone and before dilution through the use of cutting agents.

4

to get access to the precursor material and transportation.  *See id.*  They were successful, and, for approximately six months, the Akashas and Goswami worked together to transport between five and six tons of abba from Nairobi to South Africa, and they were paid between $600,000 and $700,000 per ton.  PSR ¶ 51.  Similarly, the Akashas and Goswami worked with a China-based affiliate of the Akashas to transport abba from China to South Africa.  PSR ¶ 53.  This conduct, which took place between 2013 and 2017 (including after their November 2014 provisional arrests in Kenya, while their extradition to the United States was pending), involved the Akashas importing approximately 10 to 11 tons of abba to South Africa in exchange for between approximately $300,000 and $350,000 per ton.  *Id.*  This lucrative business was only one part of the Akasha DTO's distribution network.

### C.  Heroin and Methamphetamine Importation Conspiracy

In March 2014, Baktash Akasha was approached by a DEA confidential source ("CS-1") who introduced him to a second confidential source ("CS-2").  CS-2 indicated that his name was Rashid and that he represented Colombian drug traffickers who wanted to import high-quality heroin into the United States.  PSR ¶ 54.[2]

On March 28, 2014, members of the Akasha DTO met with CS-2 at a restaurant in Kenya.  PSR ¶ 55.  At this meeting, Baktash Akasha eagerly told CS-2 that the Akasha DTO could provide him with "100 percent" pure heroin, and stated that he believed that CS-2 was the kind of "connection" that they had "been looking for about 20 years."  *Id.*  Baktash Akasha bragged about

---

[2] Quotations and summaries of the recorded meetings and conversations which took place during the course of this investigation are based on draft transcripts and/or translations of these recordings, which took place in several languages.  [U/I] indicates an unintelligible portion and [//] indicates that voices overlap on a recording.

the Akasha DTO's scope, assuring CS-2 that he could provide "the quantity [of heroin] you dream of, you and your people dream of." *Id.*  Notably, Baktash Akasha stated in the conversation that law enforcement ("they") had searched for "us," not just "him," which is indicative of the defendant's longstanding involvement in the Akasha DTO's trafficking.  Faisal Akasha—another one of the defendant's brothers and a member of the Akasha DTO—who was present at this initial meeting, hammered home the history of the Akasha family and the Akasha DTO, adding that "whoever comes, and wherever they come from, and say this name [Akasha] they know we are drug dealers."  PSR ¶ 56.

Shortly after the March 28 meeting, Baktash Akasha and the defendant met with Goswami to offer him the opportunity to join in their plan to import massive quantities of heroin into the United States.  PSR ¶ 57.  At this meeting, the defendant and a bodyguard were both armed with pistols—a common thread woven throughout the Akasha DTO's dealings.  *See id.*  During this meeting, the defendant and his brother exalted in telling Goswami about their potential deal, noting that they were excited because of the high market price for heroin in the United States, and the Akashas pledged to contact multiple heroin suppliers to try to find a source.  *Id.*  Goswami also agreed to contact a source—Hafeez—about obtaining the heroin that CS-2 requested.  *Id.*  Indeed, the defendant and his brother traveled to Tanzania, in May 2014, to meet with two other heroin suppliers that they had previously mentioned to Goswami.  PSR ¶ 60.  While there, Baktash Akasha called Goswami to tell him that one of the suppliers was available to provide heroin as a sample for CS-2, and the defendant separately called Goswami to tell him about a second supplier who said the same.  PSR ¶ 61.  Thus, from the start, the defendant himself was actively involved in the highest-level of negotiations for their heroin distribution.

As their heroin partnership with CS-2 was progressing, the Akasha DTO also began to consider a second track for narcotics distribution with CS-2 and his organization. The defendant participated in meetings with ephedrine manufacturers, and, in approximately June 2014, the Akashas started to communicate with CS-2 about obtaining ton quantities of ephedrine so that they could manufacture methamphetamine in Africa to distribute in the United States. PSR ¶ 64.

The Akasha DTO took a respite from their negotiations for Ramadan, which lasted from late-June until late-July 2014, and monsoon season, which was a serious impediment to the shipment of heroin, and which ran through early September 2014. PSR ¶ 68. Once those hurdles cleared, however, the parties quickly pressed full steam ahead. On September 19, 2014, the defendant, Baktash Akasha, Goswami, Hussein, and a messenger sent by Hafeez named Ibrahim Bhaibhai, also known as "Nadim," participated in a meeting at Baktash Akasha's house in Mombasa. *See* PSR ¶ 69. During this meeting, the participants discussed their relationship with Hafeez and the potential options for payment for heroin, which included three primary options. *Id.* CS-2 expressed an interest in purchasing 400 kilograms of heroin that Hafeez had stashed in Tanzania, and Baktash Akasha showed him photographs of a private airport in Tanzania that they could use to send the heroin to West Africa for importation to the United States. *Id.*

On September 21, 2014, the defendant and his brother participated in another recorded meeting with CS-2 and Goswami. During the course of this meeting, the defendant demonstrated his active role in the Akasha DTO's drug sourcing and distribution:

| Participant | Translation |
|---|---|
| 1. Ibrahim: | We got it. |
| 2. CS-2: | You got it? |
| 3. Ibrahim: | Uh huh. |
| 4. CS-2: | Good. So we go? |
| 5. Ibrahim: | No, they'll bring it. |
| 6. CS-2: | Here? |

7

| 7. | Ibrahim: | Uh huh. Already [U/I] people [U/I] . . . |
|---|---|---|
| 8. | CS-2: | No, I'll go. We go . . . I want to get it from there and then send it. Why, why I want it here? |
| 9. | Ibrahim: | Let's see the sample. How will you know . . . you want to see the sample, yes? Or you want to buy the whole thing? |
| 10. | CS-2: | No, the whole thing. We need to . . . yes. I'll go with you, me and you can go. Or, you want to go? |

Later in the same meeting, the defendant recounted his discussions with a methamphetamine supplier, and that he was promised the "best quality" drugs:

| Participant | | Translation |
|---|---|---|
| 1. | Baktash: | Nairobi. |
| 2. | Goswami: | Why don't you? |
| 3. | CS-2: | So we go to Nairobi. |
| 4. | Baktash: | Yes. |
| 5. | Goswami: | No, why don't you go day after tomorrow? |
| 6. | CS-2: | No, I want to go tomorrow.  Because I have to send the pilot. He needs to go. I have other stuff with him. |
| 7. | Goswami: | You, you, sure you will get it? |
| 8. | Ibrahim: | Uh huh. |
| 9. | Goswami: | Because my guy told me, day after tomorrow for sure he, he will get it. |
| 10. | CS-2: | You're sure, Ibrahim, huh? |
| 11. | Ibrahim: | Uh huh. |
| 12. | CS-2: | 100%? |
| 13. | Ibrahim: | Yes. |
| 14. | CS-2: | I can call my pilot now. |
| 15. | Baktash: | So he doesn't come to Mombassa? You'll be in Nairobi. |
| 16. | CS-2: | No, he is coming to Mombassa to get us.  We are going on the plane. |
| 17. | Baktash: | [U/I] ah, okay. |
| 18. | CS-2: | We fly on the plane, my plane. |
| 19. | Ibrahim: | Sure.  Sure. |
| 20. | CS-2: | Okay? |
| 21. | Ibrahim: | But Lali has to arrive first.  Lali has not yet arrived. [U/I] Wait, there's this guy. He used to teach in Nairobi. |
| 22. | Baktash: | Nairobi, [U/I]. |
| 23. | Ibrahim: | [U/I] driving . . . |
| 24. | Baktash: | Over, over the border. |
| 25. | CS-2: | Ah, okay. |
| 26. | Baktash: | But that is good . . . |
| 27. | Ibrahim: | [U/I]Hello? |
| 28. | Baktash: | [U/I]. |
| 29. | CS-2: | Just because we don't waste time. |

8

| 30. | Ibrahim: | And now, and now I'm going to best quality. [U/I].  To check with [U/I]. He told me, 'Ibrahim it's a very simple thing. It's ice ice.' |
|---|---|---|

And, finally, the defendant discussed his own history of stealing "tons and tons" of ephedrine from a Government laboratory.  The defendant emphasized that he used to "bribe everybody" and that he previously had obtained "one thousand kilos" and that "[n]o matter how many tons" he received he liked to store and transport them himself:

| | Participant | Translation |
|---|---|---|
| 1. | Ibrahim: | Before we used to go steal from the government lab. Ephedrine. |
| 2. | CS-2: | From where? |
| 3. | Ibrahim: | The government's lab. Laboratory. |
| 4. | CS-2: | Here? |
| 5. | Ibrahim: | No, Nairobi. I used to steal a lot. |
| 6. | CS-2: | How would you do it? |
| 7. | Ibrahim: | [U/I] see. |
| 8. | CS-2: | Oh yeah? |
| 9. | Ibrahim: | [U/I] see. I used to go steal tons and tons. |
| 10. | CS-2: | Easy, or hard, or hard? |
| 11. | Ibrahim: | Huh? |
| 12. | CS-2: | It was easy or hard? |
| 13. | Ibrahim: | It was hard, but the men I used to do [U/I] care. |
| 14. | CS-2: | Oh, you have people? |
| 15. | Ibrahim: | Yeah, I used to bribe everybody.  I used to be young. |
| 16. | CS-2: | Ah that's what I am telling you, you pay everybody. |
| 17. | Ibrahim: | You pay everybody [U/I] at night [U/I] I go, and I own a van. I load it full.  [U/I]. |
| 18. | CS-2: | How much you get? |
| 19. | Ibrahim: | Before [U/I] one thousand [U/I] kilos. |
| 20. | CS-2: | That's it? |
| 21. | Ibrahim: | Yes, and I used to give those people almost, uh, four, 450 dollars. But I used to be young, I used to . . . take the money and go clubbing, give to friends, buying cars, this . . . Even Baktash's stuff, one time they arrest him for stealing from the police. [U/I]. I take, I keep. I store it. I have good friends. I can store anything. No matter how many tons. |
| 22. | CS-2: | Over there? |
| 23. | Ibrahim: | Over in Nairobi.  No matter how many tons. I do it myself.  Everything, I like to do myself. |

9

The following day, the defendant fulfilled his promise, and he traveled with CS-2 and others to Nairobi where they picked up two packages that contained almost a kilogram of methamphetamine.  PSR ¶ 71.  Next, within weeks, a shipment of 99 kilograms of heroin arrived in Tanzania where it was stored at a house controlled by Hussein.  PSR ¶ 72.  A one kilogram sample of this heroin was delivered to the Akashas at Baktash Akasha's house in Mombasa, and the defendant and others, armed with pistols, drove the heroin to Nairobi.  PSR ¶ 73.  On October 14, 2014, the defendant provided this one kilogram sample to CS-1.  *Id.*  When he provided the heroin to CS-1, the defendant emphasized that they could not "rush" the types of large transactions they were discussing.  The next month, the defendant delivered 98 kilograms of heroin to CS-2 in Nairobi:



PSR ¶ 75.  The defendant counted out the kilograms of heroin with CS-2, and CS-2 paid him approximately $25,000 to contribute to the transportation costs.  *Id.*  The defendant also agreed to

provide CS-2 with five additional kilograms of methamphetamine, and CS-2 provided the defendant with approximately $45,000 in exchange. *Id.* Next, on November 9, 2014, the defendant delivered CS-2 one kilogram of methamphetamine. PSR ¶ 76. Upon this delivery, the defendant promised CS-2 that it was "the same" merchandise as before, a reference to the earlier delivery of methamphetamine. The defendants were provisionally arrested by Kenyan authorities shortly after this delivery. *See* PSR ¶ 42.

### D. Rampant Bribery and Corruption Funded by Drug Sales

After they were provisionally arrested in Kenya, the defendant and other members of the Akasha DTO engaged in a rampant bribery campaign to delay their proceedings, avoid extradition, and obstruct justice before this Court. PSR ¶¶ 80-82. They paid bribes to Kenyan law enforcement personnel, prosecutors, and at least three judges, and their scheme was successful for years. *Id.* First, the defendant and his co-defendants were able to obtain bail, which allowed them to escalate their efforts to obstruct justice in the United States. PSR ¶ 81. Following their release, the defendant and his co-defendants were able to obtain repeated adjournments of court dates in the hopes that it would weaken the U.S. Government's case due to a loss of witnesses and evidence. *Id.* Then, the defendant and his co-defendants were able to persuade a judge in Kenya to issue an order directing U.S. personnel to appear in Kenya—after learning that U.S. prosecutors and agents would not do so—understanding that the anticipated non-compliance would serve as a basis for additional and indefinite delay. *Id.*

Further flaunting this Court's authority and abusing the Kenyan justice system, the defendants continued to traffic drugs while out on bail in order to fund their obstruction efforts. In addition to the continued transport and distribution of methaqualone precursors, they increased their efforts to manufacture large quantities of methamphetamine in Africa. PSR ¶ 82. In

December 2015, the Akashas and Goswami agreed to jointly acquire a one-third share in ephedrine output from Avon Pharmaceuticals, and they were told that 10 to 12 tons of ephedrine that had been illegally produced was already stockpiled. *Id.* After their initial connection to this ephedrine supply backed out of their deal, Goswami and the Akashas then worked with a lower-level manger at Avon to obtain ephedrine, and made an initial payment of $100,000 for 3.5 tons. *Id.*

In approximately March 2015, the defendant and his co-defendants took steps to set up methamphetamine laboratories in Tanzania and Mozambique. PSR ¶ 83. The defendant was slated to oversee the operations at the Tanzania factory, and understood that the methamphetamine would be distributed in the United States. Fatico Tr. at 38-40. In April 2016, another relative of the Akashas traveled to India to work to transport the 3.5 tons of ephedrine they had previously purchased to the factories they had established in Africa. PSR ¶ 84. This plan was disrupted, however, when law enforcement in India seized approximately 18 tons of ephedrine from the Avon factory, including the 3.5 tons the Akashas were seeking to purchase. *Id.* The defendant and his co-conspirators were forced to abandon the plan. PSR ¶ 85.

### E. Firearms and Violence

In addition to his obstruction, corruption, and drug trafficking, the defendant was violent. He owned and possessed several firearms, and used security who possessed the same. One of the starkest examples of the defendant's violent nature took place in connection with his dealings with Armstrong. PSR ¶ 88. In 2014, Armstrong asked the Akashas and Goswami to help him with immigration issues he was having in Kenya in exchange for 500,000 methaqualone tablets. *Id.* The Akashas and Goswami paid $200,000 to another member of the Akasha family, who was supposed to bribe Kenyan officials to resolve Armstrong's immigration issues, but Armstrong fled Kenya without having given the Akashas the promised 500,000 tablets or repaying

the $200,000 spent.  PSR ¶ 89.  After Armstrong fled, Baktash Akasha also told Goswami that he had heard that Armstrong was blaming him and Goswami for his immigration issues, and that he had also heard that Armstrong was trying to have them killed.  *Id.*

Later that year, Armstrong returned to Kenya.  PSR ¶ 90.  The defendant, along with Baktash Akasha, Goswami, and an armed bodyguard, found him at a hotel in Mombasa, where they threatened him.  *Id.*  The next day, the Akashas kidnapped Armstrong and brought him to Baktash Akasha's house, where the defendant and others severely beat Armstrong and continued to threaten him.  *Id.*  The defendant was the person responsible for kidnapping Armstrong from the hotel and bringing him to Baktash Akasha's home.  Fatico Tr. 53.  During the course of this attack, Baktash Akasha brandished a pistol, and he pointed it at Armstrong's head and threatened to kill him.  PSR ¶ 90.  The defendant was present during the course of this attack and participated in the threats against Armstrong.  Fatico Tr. 54-55.

Armstrong was eventually released, but, in September 2015, the defendant learned that Armstrong was again at a hotel in Mombasa, where the Akashas and Goswami surprised him and again beat him.  PSR ¶ 82.  During the course of this second attack on Armstrong, one of Goswami's phones was used to record parts of the assault, and photographs depict the defendant and his brother as they wiped blood from Armstrong's face.  *Id.*  The defendant and his brother both beat Armstrong, and the defendant had a "gun in his hand" while pummelling him.  Fatico Tr. 68-69; PSR ¶ 93. As the defendant was beating Armstrong and holding his firearm, he was also demanding to know why Armstrong had not repaid the Akashas the money they were owed.  *Id.* While Armstrong promised to repay his debt following this attack, he died of a heart attack shortly after.  PSR ¶ 93.

Around this same time, a South Africa-based associate ("Pinky") of Armstrong began to direct threats at the Akashas and Goswami.  PSR ¶ 94.[3]  As a result, the defendant, his brother, and Goswami decided to have Pinky killed in a public way to convey a message that the group would not tolerate such threats.  PSR ¶ 94; Fatico Tr. 60-67.  The defendant was involved in this plan from its origination.  He participated in the initial meeting with Goswami and Baktash Akasha at which they made the plan and decided to hire an assassin to kill Pinky.  Fatico Tr. 61-62.  Based on their agreement, Goswami coordinated the murder of Pinky in South Africa, and the killer shot Pinky 32 times on a public street in South Africa.  PSR ¶ 94.  In the month between the agreement to kill Pinky and Pinky's murder, the defendant often asked Goswami what was happening with the murder and "how fast" they could get it done.   Fatico Tr. 62-63.  Indeed, the defendant was so bent on carrying out the murder quickly that he told Goswami that he was "going to do whatever we have to do" and that he wanted to kill him "as soon as possible."  Fatico Tr. 64.  And in a reaction that is nothing short of chilling, the defendant was so excited when he learned of Pinky's death that he started shooting a shotgun into the air.  Fatico Tr. 64-65.  Later on, the defendant relied on his participation in this murder to threaten another drug trafficking rival, Clement.  Fatico Tr. 66-67.  Following a dispute between Clement and the defendant regarding transport of the Akasha's methaqualone, the defendant threatened Clement by telling him "look what happened to Pinky, we killed him, we have him killed" and by warning that Clement was "next."  Fatico Tr. 67.   The defendant took pride in his violence.

---

[3] The murder of "Pinky" was one of the central issues during the *Fatico* Hearing conducted by the Court, as the defendant refused to accept responsibility for his involvement in the murder.  As noted above, after extensive testimony from Goswami about the defendant's involvement, the Court credited his testimony and accepted the facts in the PSR as true.

Another example of the defendant's violent ways came in 2015, when a Kenyan political figure and associate of Armstrong ("Livondo") confronted the Akashas and Goswami at a mall in Mombasa.  PSR ¶ 95.  After the altercation grew physical and Baktash Akasha and Livondo exchanged blows, the defendant drew a handgun, causing people to flee from the mall. PSR ¶ 95; Fatico Tr. 56-58.  After the defendant pulled out his handgun, he pointed it at Livondo and threatened Livondo by stating bluntly "I'm going to kill you."  *Id.*  After this incident, the defendant and his brother, concerned that they would be criminally charged, went to the local police station to resolve the situation with bribes (a common practice for the Akashas) and also stored multiple guns with Goswami, who returned them to the Akashas when they were done at the police station.  *Id.*  The Akashas later confirmed to Goswami that they "bribed the police officer in charge of the police station" to fix "the problem."  Fatico Tr. 58.

The defendant's violence did not start or end with his issues with Armstrong and associates.  For example, in 2014, the defendant and his brother took violent action against associates of their drug-trafficking rival, Ali Punjani.  PSR ¶ 97.  The Akashas kidnapped and brought "Speedy," Punjani's lieutenant, to Baktash Akasha's home in Mombasa, where they each took turns beating him until he bled.  *Id.*  During the course of *this* beating, the defendant, Baktash Akasha, and Goswami, along with other members of the Akasha family, all "beat [Speedy] very badly."  Fatico Tr. 71-72.  After the beating, Baktash Akasha decided to take Speedy to Punjani's hotel to show Punjani that they were able to "beat [the] shit out of your guy and deliver him to your place."  *Id.*  The defendant was party to this conversation and was involved in bringing Speedy to Punjani's hotel.  *Id.*  A portion of Speedy's beating was captured on video, and images showed welts and bleeding on his head.  PSR ¶ 97.

That same year, in 2014, Baktash Akasha and the defendant violently assaulted Tony Sanghani, who the Akashas believed was trying to set up an alliance to cut the Akashas out of the drug business.  PSR ¶ 98; Fatico Tr. 73-74.  In response, the defendant, Baktash Akasha, and others violently attacked Sanghani, and beat Sanghani so severely that he lapsed into a coma for several days.  *Id.*  Baktash Akasha later bragged about this attack to CS-2, stating that he "beat the Indian in front of him. . . and I said Mombasa is mine and I'm taking it back."  PSR ¶ 99.  On October 1, 2014, while Sanghani was unconscious in the hospital, an associate of the defendant's snuck into the hospital and took photos of him with breathing tubes attached to his mouth, which he then sent to the defendant and which were recovered from the defendant's phone after his arrest:

 

The defendant later showed these photographs to Goswami, and, with callous laughter, said to Goswami "look what we did, we beat him in front of Ali Punjani and he cannot do nothing to us."  Fatico Tr. 75.  The defendant was brazen and blood-thirsty enough to laugh and talk "proud[ly]" of the coma they had caused.  *Id.*

Finally, towards the end of 2016—months after the defendant had been arrested and put on notice of the charges pending against him in this Court—the defendant and his brother confronted Punjani himself at a nightclub in Mombasa.  PSR¶ 102; Fatico Tr. 77-79.  The defendant, his brother, and their security were all armed.  *Id.*  The fight included almost "15 people" and was centered on the defendant and his bodyguard.  Fatico Tr. 77-78.  During the course of the fight, the defendant "had a gun in his hand" and was beating someone.  *Id.*  The fight grew heated and eventually turned into a shootout at the nightclub.  *Id.*  All parties involved in the dispute sustained injuries, and the defendant and his brother made false statements to authorities in an effort to avoid arrest and violation of their corruptly obtained bail packages in Kenya.  *Id.* After the fact, Goswami discussed the altercation with the defendant, and the defendant said that they had "took the power back" from Punjani by fighting Punjani's own men at Punjani's own club.  Fatico Tr. 79.  This, again, took place after the defendant had been arrested and put on notice of the charges against him in this Court, which did nothing to temper his criminal behavior. Instead, he remained a violent, unrepentant, drug dealer.

## III.   Procedural History

On October 24, 2018, the defendant waived indictment and pleaded guilty pursuant to a plea agreement (the "Plea Agreement") to the six counts contained in Information S12 14 Cr. 716 (VM) (the "Information").  PSR ¶¶ 1, 11.  Pursuant to the Plea Agreement, the defendant has stipulated, among other things, that (1) the offense involved more than 90 kilograms of heroin and more than 45 kilograms of methamphetamine; (2) the defendant possessed a firearm during the course of the offense; and (3) the offense involved between 3 and 7 firearms, including a machine gun.  PSR ¶¶ 11-25.  The calculations in the Plea Agreement result in a stipulated Guidelines Sentence of life imprisonment, with a mandatory minimum term of 120 months' imprisonment.

17

PSR ¶ 34.  The Probation Office recommends a sentence of life imprisonment.  PSR at p. 36

("Sentencing Recommendation").  The Probation Office notes that the defendant was "violent"

and helped arrange a the murder and several assaults, and the defendant was involved in years of

bribery to evade justice in the United States.  PSR at p. 37.  Further, after a detailed evaluation of

the defendant's upbringing, the Probation Office notes that there were "no grounds for a departure

or variance" based on the "huge amounts of extremely dangerous drugs and several acts of

violence" perpetrated by the defendant.  PSR at p. 38.  The Probation Office concludes that the

defendant presents "a high risk for future criminal activity" given, in part, the "family history of

criminal enterprise."  *Id.*

## IV.   A Guidelines Term of Life Imprisonment is Appropriate

### A.   Applicable Law

The Guidelines still provide strong guidance to the Court in light of *United States*

v. *Booker*, 543 U.S. 220 (2005) and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005).

Although *Booker* held that the Guidelines are no longer mandatory, it also held that the Guidelines

remain in place and that district courts must "consult" the Guidelines and "take them into account"

when sentencing.  543 U.S. at 264.  As the Supreme Court has stated, "a district court should begin

all sentencing proceedings by correctly calculating the applicable Guidelines range"—that "should

be the starting point and the initial benchmark."  *Gall* v. *United States*, 55 U.S. 38, 49 (2007).

After that calculation, however, a sentencing judge must consider seven factors

outlined in Title 18, United States Code, Section 3553(a): "the nature and circumstances of the

offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); the four

legitimate purposes of sentencing, *id.* § 3553(a)(2); "the kinds of sentences available," *id.* §

3553(a)(3); the Guidelines range itself, *id.* § 3553(a)(4); any relevant policy statement by the

Sentencing Commission, *id.* § 3553(a)(5); "the need to avoid unwarranted sentence disparities among defendants," *id.* § 3553(a)(6); and "the need to provide restitution to any victims," *id.* § 3553(a)(7).  In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

    (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)    to afford adequate deterrence to criminal conduct;

    (C)    to protect the public from further crimes of the defendant; and

    (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

*See* 18 U.S.C. § 3553(a)(2).  Courts may not presume that the appropriate sentence necessarily lies within Guidelines range, but "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process."  *Gall* v. *United States*, 552 U.S. at 50 n.6.  Their relevance throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita* v. *United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 552 U.S. at 46; *see also Rita* v. *United States*, 551 U.S. at 349.  To the extent a sentencing court varies from the Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance."  *Gall*, 552 U.S. at 50.

### B.  Analysis

The Government respectfully submits that a substantial sentence is necessary under the Guidelines and the Section 3553(a) factors, and would reflect the unique and destructive nature of the defendant's criminal conduct.

### 1.  The Nature and Circumstances of the Offense

The nature and circumstances of the offense call for a substantial sentence.  The defendant was a prime participant in a massive international drug distribution organization— conduct that warrants a serious sentence, standing alone.  The defendant also participated in violence and murder—conduct that, again, justifies a serious sentence, standing alone.  And the defendant sought to obstruct justice in this Court through a lengthy campaign of drug-fueled bribery and corruption.  In the aggregate, this conduct demands a sentence that reflects the serious nature of the offense, a sentence of life imprisonment.

The Akasha DTO was an international drug organization distributing massive quantities of lethal drugs.  The defendant was the right-hand man of his brother, the leader of the Akasha DTO, and he participated in all of the organization's activities.  During the course of this investigation, for example, the defendant was involved in high-level meetings and negotiations between the Akasha DTO and the confidential sources, and the defendant was the person trusted with delivering 99 kilograms of heroin—millions of dollars of drugs—to CS-2.  In addition, the defendant carried out brutal acts of violence in furtherance of the Akasha DTO's drug trafficking.  The breadth of the defendant's drug trafficking, even if limited to the heroin distribution partnership entered into in connection with this investigation, is staggering.[4]   And this conduct,

---

[4] For example, in fiscal year 2017, only 43 out of 2,626 defendants prosecuted for trafficking in heroin had a base offense level of 38—which the defendant would have had, even with only the

20

as the defendant himself bragged during the course of the investigation, was only a small portion of his historical drug trafficking.[5]  For example, the defendant bragged of the tons and tons of drugs he had previously stolen and stored, and also participated in the sourcing and distribution of methamphetamine.

In addition to the massive drug trafficking the defendant participated in, he also needs to be held accountable for his violence.  As detailed above, in the PSR, and at the *Fatico* hearing, the defendant regularly used extreme violence to protect the Akasha's lucrative drug business.  He threatened, beat, and killed his rivals.  He kidnapped.  He possessed firearms and had security who did the same.  As he has admitted, he was involved in a conspiracy to possess, carry, and use *machine guns* in connection with his drug trafficking crimes.  His violence also speaks to the need for a Guidelines sentence.

Finally, the nature and circumstances of the defendant's conviction on Count Six, involving his obstruction of justice, counsel in favor of a serious sentence.  The defendant and his

---

heroin quantity contained in the Plea Agreement.  *See* Ex. A (statistics compiled by the United States Sentencing Commission); PSR ¶ 15.  Similarly, regarding methamphetamine, only 642 of the 7,077 individuals prosecuted started at a base offense level of 38—which the defendant would have had, even with only the methamphetamine quantity contained in the Plea Agreement.  *See id.*

[5] While evidence of the defendant's drug dealing before meeting with CS-2 did not form the basis of charges in this case or the Guidelines calculation in the Plea Agreement the Court is, of course, free to consider this information in determining the appropriate sentence. *See United States* v. *Watts*, 519 U.S. 148, 152 (1997) ("Highly relevant—if not essential—to [the judge's] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics.") (internal quotation marks omitted); *see also* 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."); *United States* v. *Reese*, 33 F.3d 166, 174 (2d Cir. 1994) ("[W]hen determining sentence, a sentencing court is free to consider hearsay evidence, evidence of uncharged crimes, dropped counts of an indictment and criminal activity resulting in acquittal.").

co-conspirators did everything they could to defy this Court and the American judicial system. They bribed their way to delay after delay, and were brazen enough to continue to deal drugs to fund their bribes while corruptly released on bail pending extradition.  They paid off everyone they could—prosecutors, judges, and others—and did so to significant success, able to delay the proceedings for years.  While the defendant's obstruction was ultimately unsuccessful, it did allow him to continue to wreck havoc in his community in the interim.  The defendant continued to distribute drugs, planned to open a methamphetamine factory, engaged in violent attacks on drug rivals, and even continued to use drugs, himself.   Ultimately, the defendant's efforts to obstruct justice demonstrate his commitment to a life of crime and his utter lack of regard for the United States judicial system.  The appropriate sentence should take into account this egregious behavior.

### 2.  The History and Characteristics of the Defendant

While the defendant has no prior arrests or reported convictions, his life is replete with troubling criminal conduct.  For example, as noted in the PSR, the defendant participated in "assaults and threats of violence in Kenya" which he was never prosecuted for, and he was involved in trafficking ton quantities of methaqualone and substantial quantities of cocaine in Kenya.  PSR ¶¶ 127-28.  His conduct did not cease upon his arrest in Kenya.  Indeed, quite to the contrary, the defendant and his co-conspirators did everything they could to *continue committing crimes*—they bribed, sold drugs, and flaunted the authority of the courts in Kenya and this Court's authority for years.  Clearly, the defendant's history and characteristics speak to the need for a serious sentence in this case.

The defendant paraded his wealth and violence on his social media and through photographs on his cellphone.  Multiple photographs from a phone seized from the defendant depict large amounts of cash generated by his criminal activity.  PSR ¶ 43.  For example:

 

Similarly, on his social media, the defendant posted photographs of an expensive car (with the caption "4 da ladys"), cash, and jewelry:

 

The defendant also was not shy about photographing the tools of his drug trade—his firearms. As recounted above, the defendant always had at least a pistol during his drug trafficking, and he also maintained security who were ready for the same. The defendant brandished and fired his weapons with frequency, and sometimes merely in celebration of a criminal "victory," including the murder of Pinky. The defendant's cellphone is replete with photographic evidence of his use of deadly weapons, such as the following:

  



The defendant's self-reported income, of course, does not account for his lavish

spending or the lifestyle he lived in Kenya. The defendant claimed to the Probation Office that for

two years, between 2005 and 2007, he worked at his mother's scrapyard and earned $2,000. PSR

¶ 162. The defendant further reported that between 2007 and 2014, he worked for his mother's

shipping and transportation company, and, again, earned $2,000 during that time. *Id.* This does

not nearly explain the defendant's international luxurious lifestyle of fancy cars, massive quantities

of cash, jewelry, and bribery, because the defendant's income has come, for years, from illegal

activity. As the defendant bragged to CS-2 and as is apparent from the investigation, he was a

massive drug dealer. He had no legitimate job because he funded his life with narcotics sales.

24

The defendant has been a lifelong drug dealer who bragged of his riches.  Clearly, his history and characteristics counsel in favor of a substantial sentence.

### 3.  The Need to Afford Adequate Deterrence

The need to deter the defendant from future criminal conduct is spoken loudly by the egregious course of offense conduct established by the Government at the *Fatico* hearing. After his arrest, instead of recognizing the error of his ways and submitting to the Court's authority, the defendant did everything in his power to avoid justice.  In the process, he and the other members of the Akasha DTO spent money they earned through their drug trafficking to infect the Kenyan judicial system with corruption and bribery.  Further, while the defendant pleaded guilty in this case, he did not accept full responsibility for his criminal conduct.  The falsity of the defendant's claims of innocence and minimization of his role were exposed at the *Fatico* hearing, where the Court rejected his challenges to the facts in the PSR.  Ultimately, the defendant was not deterred by the filing of serious charges in this Court.  The defendant was not deterred by his arrest in this case.  The defendant was not deterred by the institution of extradition proceedings in Kenya. A serious sentence will send the defendant the message that he should be deterred from future criminal conduct—from future drug dealing, future violence, and future corruption—once and for all.

Similarly, a Guidelines sentence will deter other similarly situated individuals from participating in similar behavior.  While, as demonstrated in Exhibit A, the defendant's conduct places him at the very top of heroin traffickers around the World, there is still a powerful message to be sent through this sentencing to any other drug dealers contemplating the sale of their poison in the United States.  The defendant and his co-conspirators jumped at the opportunity to expand

their business to this community.  A Guidelines sentence would send the appropriate message to other international traffickers who consider the same in the future.

### 4.  The Defendant's Submission

In his submission, despite claiming that he accepts "full responsibility for his conduct," the defendant attempts to shift blame to his brother, his upbringing, and the DEA. While the defendant paints a sad picture of his upbringing, he does very little to grapple with the horrible facts of this case or his own conduct.  He also does nothing to accept responsibility for his own choices to join his family's criminal enterprise, or to account for the wealth and fame that he achieved and exploited.

There are a number of troubling arguments in the defendant's submission.  First, the defendant claims that he "cannot be heard on the recordings bragging about his connections to major drug traffickers."  Def. Submission at 9.  Following a two-day *Fatico* hearing, the Court is not limited to the recordings of the defendant's crimes, and the hearing established not only such bragging but also numerous acts of large-scale drug trafficking, violence, and corruption. Moreover, counsel's claim is demonstrably false.  During the course of the recorded meeting on September 21, 2014, the defendant stated that "we got it" in reference to a sample of methamphetamine obtained from a Tanzania-based drug trafficker known as Lali, and he confirmed that Lali was planning to bring the sample to them.  PSR ¶ 70.  Implicit, of course, is that he was in contact with Lali.  Similarly, later in the same meeting, the defendant is the one that confirms he is 100 percent sure that the product would arrive and that he had himself spoken to the supplier and confirmed that it was the "best quality."  *See id*.  Later on, again in that meeting, the defendant notes that he used to "steal tons and tons" of ephedrine from a government laboratory.  Finally, while not recorded, the defendant also told Goswami that he had found a

26

supplier named Harriri in Tanzania who had access to heroin that they could use in the deal with CS-2. PSR ¶ 61. This is corroborated by a contact listed in the defendant's phone, showing contact information for a "Hariri TZ" (Hariri Tanzania). Despite his efforts to paint himself to the contrary, the defendant was clearly long enmeshed in narcotics trafficking and had significant connections in the narcotics world.

Next, the defendant claims that he did not have "any connections to individuals who could commit a murder" and brazenly seeks credit for at times trying to "diffuse a violent situation involving his brother." Def. Submission at 9. This twisted logic is difficult to understand. The defendant's conduct, as outlined above, involved a number of violent acts, including his participation in a murder-for-hire. The defendant appears to want credit for not being the person who had the connection to the actual murderer, while ignoring that he himself was involved in every step of the plot. This flies in the face of conspiracy law and common sense. This also is contradicted by the record before the Court, replete with the defendant's use of firearms, threats of murder, kidnapping, and violence. In the face of this evidence, the defendant only admits that there are "allegations" of violence. Def. Submission at 9. These are not mere allegations at this point. The Court found at the *Fatico* hearing the defendant participated in the plot to murder Pinky and the other "acts of violence that are attributed to [him]" in the PSR. Fatico Tr. 246-47. Thus, here too, the defendant demonstrates a troubling inability to accept responsibility for what he has done, and instead is attempting to shift blame to his co-conspirators.

The defendant laments that his Guidelines range—which he stipulated to by plea agreement—was driven largely by "amounts [of drugs] the DEA instructed the confidential informants to request." Def. Submission at 10. This, too, is an argument that borders on the frivolous. This is not a case in which there was just idle chatter about quantities impossible to

27

attain or inflated claims by defendants unable to fulfill them.  Quite the contrary, the defendant

and his co-conspirators were more than willing to fulfill the requests made by the confidential

sources; they provided 100 kilograms of high-quality heroin—*100 times the amount necessary to*

*trigger the sentence the defendant now seeks*—had 500 kilograms of heroin en route to Africa at

the time of their arrests, and had made promises that they could provide much more.  They

contacted multiple international heroin suppliers to fulfill the requests from their purported

customers, and they had no problem obtaining the heroin quantities that were desired.  They

similarly were able to supply large quantities of methamphetamine and were in discussions to set

up methamphetamine *laboratories* in Mozambique and Tanzania while out on bail in connection

with this case.  It is astounding that the defendant now blames the DEA for the "inflated" quantities

he is responsible for.[6]

---

[6] At the sentencing of Baktash Akasha, the Court noted correctly that this case involved use by the
DEA of the sting technique.  Aug. 16, 2019 Tr. 37.  However, the DEA targeted the defendants
because they were violent, large-scale drug trafficking involved in ongoing criminal activity.  Once
targeted, the defendants provided large quantities of actual heroin and methamphetamine in
response to the use of the sting technique, amply illustrating their ability and intent to engage in
this conduct on the scale reflected in their negotiations with the confidential sources.  Moreover,
while it is true that the transactions at issue "never materialized into an actual importation of
narcotics into the United States," *id.*, that is only because the DEA seized the drugs in Africa.  The
defendants had every intention of reaping the financial rewards of successfully importing heroin
and methamphetamine into this country, and they did all that was necessary on their parts into
achieve that.  That conduct constituted a completed violation of 21 U.S.C. § 959(a), which
prohibits the distribution of a controlled "knowing, or having reasonable cause to believe that such
substance or chemical will be unlawfully imported into the United States substance."  The drug
seizures and failure to complete an act of importation are therefore not mitigating as to the
defendant.  Finally, at the sentencing of Baktash Akasha, the Court analogized to the differences
in penalties between murder and attempted murder.  Aug. 16, 2019 Tr. 37.  In addition to the fact
that the defendant engaged in completed violations of Section 959(a), the penalties for completed
importation, attempt, and conspiracy are the same, *see* 21 U.S.C. § 963, and this structure reflects
the considered decision of Congress that even inchoate conduct relating to these types of drug
trafficking are worthy of serious punishment.

Finally, the defendant submits a lengthy "mitigation report" ("Def. Rep.") prepared by a consulting project hired by the defendant, along with a number of letters from family and friends.  Seemingly based only on interviews with the defendant (who had obvious interests at stake) and his family, the mitigation report details a number of traumatic events in the defendant's life that the report alleges contributed to his criminal conduct.  While the Government is certainly sympathetic to certain of the incidents reported by the defendant and family, they cannot be read as a blanket excuse for his years of violence and criminal conduct.  Indeed, it seems unlikely that the relatives who describe the defendant as "friendly, calm and family-oriented," Def. Rep. at 14, or "caring and concerned," Def. Rep. at 5, have been witness to the violent beatings the defendant perpetrated, seen him carrying shotguns or pistols, or learned of his involvement in international murder plots.  It seems similarly unlikely that his sister, who describes him as "hardworking, generous, kind and humble," has first-hand knowledge that the defendant transported almost 100 kilograms of heroin, negotiated drug deals with multiple international drug traffickers, and was violent and gun-toting for years.  Def. Rep. at 13.  Finally, the report makes much of Kenyan culture and the "collectivist" nature of this culture.  Def. Rep. at 18-23.  Because of his culture and family, the report excuses his conduct as the "result of familial fear, intimidation and manipulation."  Def. Rep. at 23.  This conclusion is offensive to the many people in Kenya who don't choose a criminal livelihood, to any of the defendant's family members who chose a different path than the defendant, to the victims of the defendant's violence and drug trafficking, and to the law abiding members of his community who do not seek to excuse their conduct.

Similarly, the defendant blames his brother for his own conduct and endeavors to obtain leniency based on their relative culpability.  The defendant makes much of the fact that he was not present at certain meetings and did not participate in certain recorded calls.  Def.

29

Submission at 8-10.  While this is true, it is entirely beside the point.  The defendant was a central member of the Akasha DTO, and, like with most conspiracies, not all conspirators are present at every meeting.  Indeed, the defendant participated in certain meetings, like the delivery of 98 kilograms of heroin, without his brother.  All of his brother's activity was certainly foreseeable to him, and he himself participated in many meetings and much of the violent conduct that moved the conspiracy forward.

Finally, while the mitigation report says that a lengthy period of incarceration would "dramatically affect his quality of life and others who depend on him for emotional and economic support," this is difficult to square with (a) the defendant's claims that he has made almost no legitimate money before his arrest, and (b) the toxic effect that someone like the defendant can have on those around him, including the victims of his violence. Indeed, it is worth noting that many of the letters seeking leniency for the defendant note that he "supported" the writers and their families—such financial support, of course, came entirely from illicit gains made by the defendant, his brother, and other members of the Akasha DTO.  In sum, the Government respectfully submits that the "mitigation report" should be looked at through a skeptical lens and the self-interested facts reported therein cannot excuse the defendant's choices and conduct.

## V.  The Court Should Impose a Within-Guidelines Fine

The defendant has not established that he is unable to pay a fine, and the Court should impose one greatly in excess of the $50,000 minimum recommended by the Guidelines.

### A.  Applicable Law

The Sentencing Guidelines provide that "[t]he court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine."  U.S.S.G. § 5E1.2(a).  "The burden of establishing inability to pay rests on

defendant." *United States v. Salameh*, 261 F.3d 271, 276 (2d Cir. 2001) (citing *United States v. Thompson*, 227 F.3d 43, 45 (2d Cir. 2000)).

### B.  Discussion

The defendant made millions of dollars as a drug trafficker and he flaunted his wealth in photographs and social media postings.  Although the Government is not seeking forfeiture of those proceeds because they related to narcotics distribution apparently lacking in a nexus to the United States, the Court can—and should—take this income into account when assessing the defendant's ability to pay a fine.  Particularly in light of the defendant's demonstrated disregard for the Court through his obstruction conviction, and his self-serving and unbelievable claims about his lack of income and financial resources, the defendant has fallen far short of demonstrating that he lacks the ability to pay a fine.  Accordingly, the Court should impose a within-Guidelines fine.

## VI.  Conclusion

For the foregoing reasons, the Government respectfully submits that a substantial sentence and a significant fine are appropriate in this case.

Dated: New York, New York
      November 1, 2019

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York

By:          /s/
          Emil J. Bove III
          Amanda L. Houle
          Jason A. Richman
          Assistant United States Attorneys

Cc:     Defense Counsel   (Via ECF)